Josh D. Gruenberg, Esq., SB #163281
Benjamin S. Silver, Esq., SB #284741
Rebecca Womelsdorf, Esq. SB #342461
GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013
TELEPHONE: (619) 230-1234
TELECOPIER: (619) 230-1074

Attorneys for Plaintiff,
**MONIKA BROEMMER**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MONIKA BROEMMER, an individual,<br><br>PLAINTIFF,<br><br>v.<br><br>OCEANEERING INTERNATIONAL, INC., an unknown business entity; JOHN BARBER, an individual; and DOES 1 through 25, Inclusive,<br><br>Defendants. | Case No.: '23CV1017 W WVG<br><br>**COMPLAINT FOR VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e, *et seq*.**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW, PLAINTIFF MONIKA BROEMMER ("PLAINTIFF" or "BROEMMER"), by and through her counsel of record, Gruenberg Law, and upon information and belief and demanding a trial by jury, for her Complaint against Defendant OCEANEERING INTERNATIONAL, INC., ("OCEANEERING" or collectively "Defendants") and Defendant JOHN BARBER, ("BARBER" or collectively "Defendants") states as follows:

## I. PRELIMINARY STATEMENT

1. PLAINTIFF brings this lawsuit alleging as against Defendants violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*..

2. Pursuant to Title VII, it shall be an unlawful employment practice for an

employer to … discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a).

3. Title VII was enacted, inter alia, for the purpose of ensuring that "[a]ll personnel actions affecting employees or applicants for employment . . . in military departments . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).

4. PLAINTIFF alleges that Defendants, and each of them, have systematically acted with the purpose and effect of denying to PLAINTIFF the same environment, terms, and conditions of employment as others similarly situated because of her sex/gender.

## II. PARTIES

5. PLAINTIFF, MONIKA BROEMMER ("PLAINTIFF" or "BROEMMER") is, and at all times herein mentioned was, a resident of the County of San Diego in the State of California.

6. Defendant, OCEANEERING INTERNATIONAL, INC., ("Defendant" or "OCEANEERING") is a private company and a global provider of engineered services and products, primarily in offshore industries. OCEANEERING provides its product and services for the maritime environment including, the Department of Defense. As a result of a contract between OCEANEERING and the United States government, OCEANEERING is responsible for the operation and maintenance of the navy submarine rescue systems.

7. OCEANEERING is located at the Naval Base Coronado (NBC), in Coronado, California as a result of their contract with the Department of Defense. The Department of Defense is part of the executive branch of the United States government.

8. OCEANEERING is an "employer" within the meaning of the statutes under which PLAINTIFF brings her claims.

9. JOHN BARBER, ("Defendant" or "BARBER") is an employee of OCEANEERING. BARBER is the Manager of the Quality Assurance Department and oversees the Certification Group at OCEANEERING. BARBER was Ms. BROEMMER's immediate supervisor and remained in a supervisory/management role at all relevant times herein.

## III. JURISDICTION & VENUE

10. The jurisdiction of this Court is founded upon 28 U.S.C. §1331 because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5(f), as hereafter more fully appears.

11. Section 717(a) of Title VII, 42 U.S.C. §2000e-16(a), extends the protections against employment discrimination afforded by the Civil Rights Acts to "all personnel actions affecting employees or applicants for employment … in military departments as defined in section 102 of Title 5 …"

12. The referenced statute provides that "the military departments are: The Department of the Army; The Department of the Navy; and The Department of the Air Force." 5 U.S.C. § 102.

13. As a civilian employee of a private company located on a Naval base, PLAINTIFF is not a member of the armed services and her Title VII claim is justiciable. *Bledsoe v. Webb* (9th Cir. 1988) 839 F.2d 1357.

14. Venue is proper in the Southern District of California because the alleged unlawful employment practices were committed in this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. 42 U.S.C. §12117; 28 U.S.C. 1391(b).

15. PLAINTIFF is entitled to file this civil action because more than 180 days have elapsed since PLAINTIFF filed her formal complaint, and less than 90 days have elapsed since receiving a Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission (EEOC) on March 6, 2023, in conformance with 42 U.S.C. § 2000e-16(c) and 2000e-5. *See* 29 C.F.R. §1914.407.

## IV. SUMMARY OF THE FACTS

16. BROEMMER is female.

17. In July of 2021, BARBER recruited BROEMMER to work for OCEANEERING. At the time, BROEMMER lived in Chicago, Illinois and wanted to relocate to the greater San Diego area. Based in part on BARBER's efforts, BROEMMER ultimately applied for a position with OCEANEERING.

18. On or around November 8, 2021, Defendant OCEANEERING hired BROEMMER as a Certification Inspector. BROEMMER began working for OCEANEERING as a civilian employee on the NBC, in Coronado, California. BROEMMER's initial job duties included, but were not limited to: inspecting materials, work and documents; and observing and verifying repair and testing procedures are performed per applicable standards associated with unique undersea systems and supporting equipment. BROEMMER was required to observe in-process work, read dials and displays, compare results againsts specifications, drawings, non-conformance reports, and materials. At all times mentioned herein, BROEMMER performed her job duties in an exemplary manner. At all times mentioned herein, BROEMMER was a dedicated, loyal, and competent employee.

19. Defendant OCEANEERING hired BROEMMER to work within the Quality Assurance Department for its Certification Group. At that time, and for a majority of the time mentioned herein, Defendant BARBER was the Manager of the Quality Assurance Department overseeing the Certification Group. BARBER was BROEMMER's immediate supervisor.

### Defendant BARBER Begins to Harass and/or Discriminate Against BROEMMER Based on Her Sex/Gender

20. The worksite of BROEMMER's employment with OCEANEERING is primarily a male-dominant field. BROEMMER was one of few females on her team. The work environment centered around a military work culture that often diminishes women or "feminine" like behaviors, concerns, and/or emotions.

21. In or around November of 2021, while at work, BARBER publicly told BROEMMER that she should "smile more". BROEMMER replied, "Well that's very misogynistic." BROEMMER felt embarrassed, disrespected, and belittled. BARBER singled BROEMMER out for being a female and had done so in front of her peers, many of them male. BARBER's comment was targeted at BROEMMER due to her sex/gender. Male employees are not told to "smile more" or anything of the like. BROEMMER had never heard BARBER make a similar comment towards her male colleagues.

22. The very next day, BROEMMER pulled BARBER aside and informed him, in private, of her belief that his comment was derogatory. BROEMMER asked that she be treated with respect. BROEMMER requested that BARBER not make similar comments again. BARBER acknowledged what BROEMMER had asked of him, and said, he believed she "should be treated fairly" and "just as I was trained when I was in the Navy, treat a sailor just like any other sailor". BROEMMER understood this to mean in the future BARBER would not single BROEMMER out based on her sex/gender. BROEMMER was hopeful the conduct would stop. BROEMMER made her concerns of discriminatory and harassing behavior known by directly complaining to her supervisor, BARBER.

**Defendant BARBER Makes Sexually Inappropriate Comments to BROEMMER**

23. During the end of 2021, the trailer for OCEANEERING's Quality Assurance Department where BROEMMER was assigned to work out of began to collapse after a rainstorm. While managers deliberated where to place employees, BARBER told BROEMMER he would have BROEMMER work in the same office as him. BROEMMER felt uncomfortable with BARBER'S comment and suggestion that she would work in his office alone with him. BROEMMER found BARBER's comment to be inappropriate and unwelcomed.

24. Over the next few weeks, BROEMMER provided reasons why she should remain working in the same room as her Certification Inspector colleagues,

many having to do with it making sense to be working in close proximity with her peers. In response BARBER told BROEMMER that the shared office space was small and that he and BROEMMER would share BARBER's office space instead, so that BROEMMER would not have to share an office with her peers Richard Newberry ("Newberry") and Eric Quick ("Quick"). Again, BARBER's comments and suggestion to work alone in his office made BROEMMBER uncomfortable. BARBER had given BROEMMER the impression that he was seeking to be alone with BROEMMER. Along with his offer to share his office space, BARBER inappropriately stated BROEMMER could change clothes in his office before going for her runs.[1] BROEMMER found this proposal to be odd and inappropriate. BARBER made these offers and comments towards BROEMMER due to her sex/gender and again was singling her out. Further, as a manager and supervisor, there was no reason why BARBER would share an office with BROEMMER. BARBER's comments were inappropriate and unwelcomed. BROEMMER found them to be offensive. BARBER attempted to provide BROEMMER with special treatment for his own personal gain. At all times, BROEMMER expressed her desire to share office space with her same-level colleagues. BROEMMER attempted to draw a clear boundary between herself and BARBER. Eventually, it was determined the Quality Assurance Inspectors would all share an office, but BROEMMER remained concerned about BARBER's prior comments and intentions.

**Defendant BARBER Confesses His Feelings for BROEMMER**

25. On or around February 14, 2022, BARBER and BROEMMER were walking during their lunch break up Moffett Road towards the ammo pier. During their walk, BARBER asked BROEMMER groundless uncomfortable questions completely unrelated to work. BARBER first asked, "Do you ever think about speaking the unspoken?" or words to that effect. BROEMMER asked what BARBER meant, to which he replied, there is a "fondness for each other."

[1] BROEMMER often went for runs during her lunch break.

BROEMMER responded, "I think we are very good friends." BROEMMER was shocked by this comment and her response clearly indicated her level of discomfort and disagreement. BARBER changed the subject, their walk ended, and both went back to work. BROEMMER did not share the same feeling BARBER had expressed. As a result, BROEMMER was confused and very uneasy about BARBER's comment and started thinking about prior interactions with BARBER. BROEMMER believed BARBER was married at the time. Further, BROEMMER felt no "fondness" towards BARBER. BROEMMER was surprised to learn BARBER had underlying feelings for her. BARBER's confession made BROEMMER feel uncomfortable at work. BROEMMER immediately began worrying about her future work-relationship with BARBER as he was her direct manager and supervisor. BROEMMER speculated that BARBER had ulterior motives for recruiting her to work at OCEANEERING.

**BROEMMER is Treated Differently due to her Sex/Gender**

26. On or around February 18, 2022, during a morning group meeting, BARBER implied that BROEMMER's "wild ideas" needed to be kept in check because after all of BARBER's "years in the Navy and in the submarine community, things have worked just fine" and there was "no need to change things" or words to that effect. BARBER made these comments in front of the team after BROEMMER suggested implementing changes to improve the efficiency of the Quality Assurance team/department. BROEMMER felt she was being dismissed because she is a woman, especially given that her ideas were characterized as "wild" and unwelcomed by her male superior. To BROEMMER's knowledge, BARBER had not singled out a male employee or diminished their input during work meetings or otherwise.

27. In response to BARBER's condescending comments, BROEMMER spoke to Manager Rod Varner ("Manager Varner"). At this time, Manager Varner and BARBER were known close friends. BROEMMER sought advice on how to handle new ideas she had for her team. During this discussion, BROEMMER also confided to Manager Varner that she was upset with BARBER's comment and felt

belittled in front of their team. BROEMMER hoped Manager Varner would provide insight on how she could better communicate to BARBER and get her points across to him, be heard by him, and be better respected by him. Instead, Manager Varner said he recognized BARBER and BROEMMER were upset and that it was best for BROEMMER to talk to Manager Varner first about any new ideas she had and that he would then relay them to BARBER. BROEMMER did not think this response was beneficial to her working relationship and created more steps and potential hurdles to her job performance and success.

28. On a separate occasion, BROEMMER asked BARBER for specific direction about vague guidance in order for her to know the exact requirements of the inspectors. In response, BARBER crossed his arms and gave an exasperated sighed, evident that he was frustrated that BROEMMER was asking questions. BROEMMER never saw BARBER react this way to her male counterparts. Defendant OCEANEERING, through and by its agents, fostered a work environment that made women feel inferior.

**BROEMMER Reports BARBER's Inappropriate Comments**

29. On or about February 22, 2022, BROEMMER reported the unwelcomed romantic confession BARBER had previously made to her on February 14, 2022, to Manager Varner. BROEMMER asked Manager Varner if BARBER had said anything to Manager Varner insinuating his feelings for BROEMMER. Manager Varner stated that BARBER had not said anything to him. BROEMMER told Manager Varner that BARBER had told her something about "speaking the unspoken" and explained that she was unsure how to handle this confession from BARBER. In response, Manager Varner told BROEMMER "absolutely not," and that whatever she had heard must have been taken out of context. Manager Varner further stated, "there is no way whatsoever that John [BARBER] would say such a thing nor imply it," or words to that effect. BROEMMER felt her complaint was being dismissed and felt her concern was not being taken seriously. Accordingly,

BROEMMER did not feel protected by OCEANEERING or its management. At that time, BROEMMER believed she could lodge complaints and concerns with her managers and was following proper procedure. Manager Varner's response made BROEMMER question her protection in the workplace. Manager Varner made BROEMMER feel as if her concerns were unwelcomed. BROEMMER contends that as a manager, Manager Varner did not properly address the inappropriate conduct reported to him by a subordinate employee. BROEMMER made known her concerns regarding BARBER's unwanted advances.

30. As stated above, Manager Varner and BARBER are known close friends who have known one another for many years. On information and belief, Manager Varner even asked BARBER to officiate his then upcoming wedding.

31. After being dismissed by Manager Varner, BROEMMER spoke with her coworkers Newberry and Quick about what had occurred. BROEMMER informed Newberry and Quick that BARBER confessed his feelings towarsd her and that as a result she was uncomfortable. BROEMMER began to feel at a loss for what she could do to ensure she was not being subjected to a hostile work environment.

**BARBER Retaliates Against BROEMMER**

32. On or around March 1, 2022, BROEMMER and BARBER had a meeting via Microsoft Teams to discuss a project. During their meeting, BARBER interrupted BROEMMER mid-sentence. BROEMMER waited until BARBER had finished speaking and stated to him that she just wanted to be heard. BARBER responded, "yeah, I know, but it's wasting my time and I have a lot to do," or words to that effect. Once again, BROEMMER felt belittled by BARBER. BROEMMER began to feel that BARBER was retaliating against her because she did not reciprocate the romantic sentiment that BARBER held for BROEMMER.

33. Following this meeting, BROEMMER again informed Manager Varner that her meeting with BARBER did not go well and again asked for advice on how to communicate with BARBER. Manager Varner provided no support or insight to

BROEMMER's concern. BROEMMER felt completely unsupported without a superior she could communicate her concerns to.

**BARBER's Harassment of BROEMMER Continues**

34. On or around March 15, 2022, BROEMMER went on a run during her lunch hour. While on her run, BARBER jogged up to her to strike up a conversation. During this conversation, BARBER again professed his feelings for BROEMMER. First, BARBER brought up the previous confession he had made to BROEMMER in February. BARBER then recollected that in years past when he had told BROEMMER there was someone special out there for her, that he had meant it was him. BARBER stated that at some point in another life, a relationship between him and BROEMMER could have been possible. Further, BARBER stated he did not deserve how he felt towards BROEMMER. BARBER stated that he believed he and BROEMMER had a lot in common. BARBER explicitly stated he had feelings for BROEMMER and he just wanted her to know. BARBER added that BROEMMER was hired strictly for professional reasons, but that he wanted her to hear his sentiments and wanted her to take it as a compliment, and that it allegedly did not change anything. BROEMMER could not believe what BARBER was telling her. BROEMMER was offended, shocked, and perplexed with what BARBER was saying. BROEMMER had done nothing to suggest that she had any of the same feelings. In fact, when BARBER first told her of his feelings the month prior, BROEMMER stated that they were just friends. BROEMMER was concerned that BARBER was even bringing up that she was hired for professional reasons and began to doubt BARBER's intentions and sincerity. BROEMMER's prior fears were being realized and confirmed.

35. In response, BROEMMER asked BARBER what he wanted from her. BARBER responded, he just wanted BROEMMER to know. Then, BARBER asked BROEMMER whether the feeling was mutual. BROEMMER was stunned and felt cornered and did not respond out of fear from BARBER her supervisor.

BROEMMER was afraid of the repercussions if she admitted that she held no romantic feelings for BARBER whatsoever. In response, BROEMMER remained silent. BROEMMER hoped that BARBER would understand her silence to mean she did not share the same feelings. Unfortunately, to BROEMMER's silence, BARBER said that there was no need to reply as he was "certain the feeling was mutual." BARBER continued to elaborate on his feelings towards BROEMMER, making her more uncomfortable by the second. BROEMMER remained stunned and offended by BARBER's persistence. BROEMMER stated she did not know what to do with this information. BROEMMER then asked BARBER if he had told Manager Varner about his feelings for her. BARBER stated he had not told Manager Varner. BROEMMER stated that it was selfish of BARBER to put his confession onto her. BARBER once again stated that BROEMMER should "just take it as a compliment and that's it." BROEMMER's fears increased.

36. BROEMMER became extremely uncomfortable around BARBER. She did not find BARBER's confession to be a compliment. In fact, the unwanted confession greatly offended her.

37. Shortly thereafter, BROEMMER reported BARBER's second confession to her colleagues Newberry and Quick. BROEMMER had received no support from Manager Varner prior and needed to make an effort to feel safe at work. As a result, BROEMMER asked to leave the office with Newberry and Quick at the end of the day. Additionally, BROEMMER asked Newberry and Quick to mark their location when out of the office so that she could have peace of mind and not have a situation where she was alone with BARBER in the trailer at any given time. BROEMMER continually spoke to Newberry and Quick regarding their whereabouts to avoid being alone with BARBER. BROEMMER also began to copy Manager Varner on all correspondence with BARBER. BROEMMER wanted to ensure there was no one-on-one interaction with BARBER.

38. Unfortunately, BARBER's unwanted harassing conduct continued. On

or around March 24, 2022, BARBER requested to run alongside BROEMMER. BROEMMER denied his request. BROEMMER could not believe BARBER's persistence and just wanted to be able to come to work and focus on her duties.

39. Feeling she had exhausted all other reporting lines, on or around March 30, 2022, BROEMMER reported in writing the unwanted sexual harassment and discrimination she had endured from BARBER to Robbin Figgins ("Figgins").[2] At the time, BROEMMER in good faith believed that Figgins was a Human Resources representative.

**BROEMMER Attempts to Draw a Clear Boundary With BARBER**

40. As mentioned above, BROEMMER wanted a work environment free of harassment and discrimination. As such, BROEMMER prepared a written respectful speech to present to BARBER in hopes of ensuring a safe workspace for herself and to draw a clear boundary with BARBER. On or around March 30, 2022, PLAINTIFF spoke the following words to BARBER:

> "I want to talk about the conversation we had during the lunch break a few weeks ago when you told me you had romantic feelings for me. I respect you solely as my supervisor and as a friend. I want to be clear that I do not have those same feelings for you, nor that level of fondness for you. I was afraid to tell you this at the time of the conversation because I was worried about repercussions at that moment and felt uncomfortable and didn't know what to do with the information given me. Do you think this is something we can put behind us and continue the working relationship?"

In response, BARBER stated yes and apologized. BARBER explained, he did not realize what his behavior would put BROEMMER through. BARBER explained he did not realize that his feelings and behavior threatened his marriage. BARBER attempted to rationalize his behavior by telling BROEMMER, that outside of his father who had died this year, BROEMMER was the only other person he felt he could confide in. BARBER further explained that due to COVID-19 he needed a little "risk" and was "bored". BROEMMER did not respond as she was stunned at what

[2] BROEMMER provided her complaint in a sealed and dated envelope.

BARBER had stated. BROEMMER felt the apology was not sincere especially given that he made efforts to explain or make excuses for his unwanted conduct. Thereafter, BROEMMER informed Figgins that she had a conversation with BARBER.

41. On April 2, 2022, BROEMMER met with a previous colleague, who knew BARBER, on her personal time. During this conversation, the previous colleague informed BROEMMER that BARBER had confessed to him his love for BROEMMER. The previous colleague confirmed that BARBER held feelings for BROEMMER long before she was hired to work for OCEANEERING. BROEMMER hoped that her concerns with BARBER would now be believed by OCEANEERING.

**BARBER's Unlawful Conduct Continues**

42. On or around May 18, 2022, BARBER told BROEMMER "your signature isn't very feminine." BARBER smirked while he said this sexist comment. BROEMMER stated she did not realize it was a job requirement, referring to her allegedly not having feminine handwriting. BARBER then laughed at BROEMMER. BROEMMER was once again humiliated and singled out by BARBER in front of Newberry and Quick.

43. On or around May 18, 2022, BROEMMER asked Figgins if she would be willing to witness an announcement BROEMMER wanted to give to the group. Figgins agreed and asked BROEMMER what and who her announcement was about. Figgins mentioned that OCEANEERING's Program Manager, Gene Doyle ("Manager Doyle") and Manager, Chuck Baker ("Manager Baker"), had been concerned for BROEMMER for a while and had asked Figgins what had been going on with BROEMMER. BROEMMER made known her desire to draw a boundary with BARBER. BARBER's conduct, and OCEANEERING's lack of response to her concerns was impacting BROEMMER.

**BROEMMER Announces The Discrimination and Ongoing Harassment**

44. On or around May 19, 2022, Figgins informed BROEMMER she would

be unable to be a witness to BROEMMER's announcement given Figgins was allegedly not Human Resources. Figgins stated that she had reported BROEMMER's concerns with BARBER to Manager Doyle. Further, Manager Doyle had told Figgins he was concerned for BROEMMER. BROEMMER was upset she was not made aware of this prior, and was further upset that despite OCEANEERING management knowing she had concerns, was visibly distressed, and had lodged complaints of harassment, nothing was being done to stop the unlawful conduct.

45. On or around May 19, 2022, during a morning group meeting, BROEMMER decided to make an announcement in front of colleagues and managers. Here, BROEMMER made the following announcement:

> "Over the course of the months here in Oceaneering I have experienced repeated incidents of flagrant disrespect. One, being told I need to smile more; Two, that my "wild ideas" need to be kept in check, in front of the whole team; Three, my signature is not feminine; And two other egregious incidents that have extinguished my motivation to come to work and made it extraordinarily uncomfortable for me to be at work. At this point the disrespect has leveled up to harassment. I deserve respect for all I have done in the before times, all I have done since I began here in this division, all I have tried and do try to accomplish for myself and the team, and all I strive for on a professional level. Today I am drawing a boundary. Such behavior will not be tolerated and will be reported to HR. If your reaction may be, that this really sucks because it impacts the comfortable cavalier male office culture… well, sometimes it really sucks to be a woman. Should anyone desire to have an in-depth side conversation about this, I am willing to accommodate that in the presence of HR and Gene. Otherwise, just understand that a boundary has been drawn with regard to how I am treated, and a course of action that will be taken should there be mistreatment. As an equal member of this team I deserve nothing less than the rest of you, which is a workplace free of harassment and one that fosters mutual respect."

BARBER, visibly upset, replied with a firm "understood" while crossing his arms. BROEMMER was worried about the repercussions moving forward.

46. Manager Mark Bryan ("Manager Bryan") had witnessed BROEMMER's announcement. Shortly following BROEMMER's announcement, Manager Bryan asked BROEMMER whether any of the personnel he manages had conducted themselves inappropriately. BROEMMER assured him that his personnel had not and thanked him for asking. Manager Bryan recommended BROEMMER report the behavior to the Program Manager, Manager Doyle, to put a stop to the behavior.

47. Shortly thereafter, BROEMMER spoke with OCEANEERING's Corporate Human Resources, Yvette Williams ("HR Williams"), and submitted a chronology of events describing the harassment and discrimination she had endured to date. BROEMMER felt extreme emotional distress from these conversations and from the pressure of the situation. Originally, BROEMMER did not want or expect the situation to go this far, but felt she had no other option given the lack of response despite her complaints, and the continued mistreatment.

48. On or around May 20, 2022, BROEMMER, Manager Doyle, and HR Williams had a meeting to discuss the ongoing issues. Manager Doyle expressed he was treating the issue as a formal HR complaint. Manager Doyle and HR Williams asked BROEMMER if she had any more evidence. BROEMMER responded no. HR Williams asked why BROEMMER had not approached Manager Doyle earlier. BROEMMER responded that she did not think anyone would believe her. BROEMMER is a single divorced woman who is unconventional in some respects. Whereas, BARBER is a retired Master Chief of the Navy who has been with the submarine rescue program for approximately 10 years, has been married for approximately 30 years, with grandchildren, and has a conventional life. Moreover, Manager Varner did not believe BROEMMER when she previously reported her concerns nor did Manager Varner provide BROEMMER with any guidance on how to proceed. Manager Doyle and HR Williams informed BROEMMER she would be moving offices and reporting to Manager Bryan. BROEMMER agreed and asked she be allowed to still contribute through her previous role in hopes of ensuring the success of her team. Manager Doyle agreed. Despite the unlawful mistreatment, BROEMMER remained committed to her duties, responsibilities, and team. On or around May 23, 2022, BROEMMER moved offices. However, BARBER remained in his office.

49. Thereafter, Manager Doyle and HR Williams instructed BROEMMER to hold meetings with her male colleagues and managers outside of the trailer, or in

an alternate area, or on Microsoft Teams. In regard to BROEMMER's support role in her previous team, BARBER was allegedly required to request BROEMMER's assistance through Manager Doyle. However, this was never executed nor was this protocol followed by OCEANEERING. OCEANEERING had assigned BROEMMER to a new team with a new project. OCEANEERING did not reassign the responsibilities or role of BARBER. BROEMMER felt like she was the one being punished through no fault of her own as her day-to-day duties were changing.

50. On or around June 15, 2022, HR Williams informed BROEMMER the situation with BARBER had allegedly been dealt with. BROEMMER expressed her continued concerns to HR Williams. BROEMMER expressed her fear in not having a place within the company and her feelings of having no clear direction. At that time, BROEMMER did not have a job title or job description as a result of reporting the harassment. BROEMMER told HR Williams that she felt equivalent to a child who was bullied and thereafter placed outside the principal's office while the bully remained in the classroom. At that time, BROEMMER struggled to receive a job description and clear role from OCEANEERING.

51. OCEANEERING allegedly conducted an investigation into the matter. However, OCEANEERING thereafter posed BROEMMER with the option to return to her original position under BARBER, thereby failing to protect BROEMMER from further harassment and discrimination. When BROEMMER denied this option, OCEANEERING ultimately offered her a new job within the company, with a new supervisor. Despite not working under BARBER, BARBER remained employed with OCEANEERING in a management level/supervisory level position, superior to BROEMMER. Additionally, given the intimate nature of OCEANEERING's work environment and overall makeup, BARBER remained employed, in charge of a team, and above BROEMMER in the corporate hierarchy/chain of command.

52. BROEMMER suffered and suffers emotional distress as a result of the unwanted sexual harassment, discrimination, and retaliation she was subjected to.

53. BROEMMER remained employed with OCEANEERING in her new position. BROEMMER performed her duties diligently and competently. Despite being in a new position BROEMMER routinely saw BARBER in the workplace and was required to attend mandatory trainings, some that BARBER led. The nature of the business required email communications between BARBER and BROEMMER to continue. Although passive, the continual interaction with BARBER caused her distress and damages to continue. BROEMMER ultimately left her job with OCEANEERING in May 2023.

## V. CLAIMS FOR RELIEF

## FIRST CLAIM

### HARASSMENT AND/OR DISCRIMINATION BASED ON SEX/GENDER

### [42 U.S.C. §2000e, *et seq.*; 42 U.S.C. §2000e-2(a); 42 U.S.C. §2000e-16(a)]

### v. All Defendants

54. PLAINTIFF re-alleges and incorporates by reference the allegations, as more fully set forth in Paragraphs One (1) through Fifty-Three (53) of this Complaint, as if set forth at length herein.

55. PLAINTIFF believes and thereon alleges that she was sexually and pervasively harassed by BARBER. Such actions are unlawful, harassing, and in violation of 42 United States Code §2000e-2(a) and have resulted in damage and injury to PLAINTIFF, as alleged herein.

56. The conduct of Defendants, and each of them, as described above was undertaken with the purpose, and resulted in, tangible discriminatory and adverse impact to PLAINTIFF's employment, all in violation of the above-mentioned federal statutes, including but not limited to 42 U.S.C. §2000e-2(a)(1)

57. As a proximate result of Defendants' willful, knowing, and intentional harassment and/or discrimination of PLAINTIFF, PLAINTIFF has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to

proof.

58. As a proximate result of Defendants' willful, knowing, and intentional harassment and/or discrimination of PLAINTIFF, PLAINTIFF has sustained and continues to sustain substantial losses in earnings, bonuses, and other employment benefits and opportunities.

59. As a proximate result of Defendants' deliberate, outrageous, and despicable conduct, plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with each of Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

60. PLAINTIFF has incurred and continues to incur legal expenses, costs, and attorney fees. PLAINTIFF is entitled to an award of attorneys' fees and costs upon being named the prevailing party in this case.

61. Plaintiff has fully exhausted her administrative remedies in conformance with 42 U.S.C. §2000e-16(c) and 2000e-5.

**SECOND CLAIM**

**RETALIATION**

**[42 U.S.C. §2000e-3(a); 42 U.S.C. §2000e-16(a) and (b)]**

**v. Defendant OCEANEERING**

62. PLAINTIFF re-alleges and incorporates by reference the allegations, as more fully set forth in Paragraphs One (1) through Fifty-Three (53) of this Complaint, as if set forth at length herein.

63. PLAINTIFF was at all times material hereto an employee covered by Title VII of the Civil Rights Act of 1964, which prohibits retaliation in employment on the basis of complaints made against unlawful discriminatory, harassing, or retaliatory treatment.

64. Defendant OCEANEERING was and is at all times material hereto an employer within the meaning of Title VII, and as such, is barred from retaliating in employment decisions for complaints made by an employment about discrimination,

harassment, or retaliation as set forth in Title VII.

65. PLAINTIFF and Defendant OCEANEERING maintained an employer-employee relationship at all times relevant herein.

66. As alleged herein, Defendant OCEANEERING retaliated against PLAINTIFF for complaining about harassment and/or discrimination based on her sex/gender.

67. The conduct of Defendant OCEANEERING, as described above, was undertaken with the purpose of, and resulted in, retaliating against PLAINTIFF for her engaging in activities protected under the law. By engaging in such conduct, Defendant OCEANEERING violated the above-mentioned federal statutes including 42 U.S.C. §2000e-3(a).

68. As a proximate result of Defendant OCEANEERING's conduct, PLAINTIFF has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

69. As a proximate result of Defendant OCEANEERING's conduct, PLAINTIFF has sustained and continues to sustain substantial losses in earnings, bonuses, and other employment benefits and opportunities.

70. As a proximate result of Defendant OCEANEERING's deliberate, outrageous, and despicable conduct, plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with each of Defendant's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

71. PLAINTIFF has incurred and continues to incur legal expenses, costs, and attorney fees. PLAINTIFF is entitled to an award of attorneys' fees and costs upon being named the prevailing party in this case.

72. Plaintiff has fully exhausted her administrative remedies in conformance with 42 U.S.C. §2000e-16(c) and 2000e-5.

///

## VI. PRAYER FOR RELIEF

73. **WHEREFORE**, PLAINTIFF prays for Judgment in her favor, and against Defendants OCEANEERING INTERNATIONAL, INC., and Defendant JOHN BARBER, as follows:

A. For compensatory damages, including loss of wages, promotional opportunities, benefits, and other opportunities of employment, according to proof;

B. For special damages in an amount according to proof;

C. For general damages, including but not limited to physical, mental, and emotional distress damages;

D. For back pay, front pay, and other monetary relief;

E. For punitive damages against Defendants in an amount necessary to make an example of, and to push, Defendants, and to deter future similar misconduct;

F. For an award of interest, including prejudgment interest, at the legal rate as permitted by law;

G. Reasonable Attorneys' Fees;

H. Costs of suit; and

I. For such other and further relief as may be just and proper.

**PLAINTIFF MONIKA BROEMMER** demands a jury trial on all issues in this case.

DATED: June 1, 2023

**GRUENBERG LAW**

s/Josh D. Gruenberg
JOSH D. GRUENBERG
BENJAMIN S. SILVER
REBECCA WOMELSDORF
Attorneys for PLAINTIFF,
**MONIKA BROEMMER**